## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**S-DEVONSHIRE, LLC and S1-DEVONSHIRE, LLC,**

                                        **Plaintiffs,**

                    -against-

**DEVONSHIRE CAMPUS, LLC,**

                                        **Defendant.**

**Docket No. 13 Civ. 3934 (RJS)**

**ECF File**

**S-DEVONSHIRE, LLC and S1-DEVONSHIRE, LLC,**

                                        **Plaintiffs,**

                    -against-

**DEVONSHIRE CAMPUS, LLC,**

                                        **Defendant.**

**Docket No. 13 Civ. 3941 (RJS)**

**ECF File**

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
## DEVONSHIRE CAMPUS, LLC'S MOTION FOR SUMMARY JUDGMENT

**DLA PIPER LLP (US)**
1251 Avenue of the Americas
New York, NY 10020
(212) 335-4500

## **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................... 1

STATEMENT OF UNDISPUTED FACTS ............................................................................... 2

APPLICABLE LEGAL STANDARD ...................................................................................... 11

ARGUMENT ............................................................................................................................ 12

 I. Devonshire is Entitled to Summary Judgment on its Counterclaim for
  Breach of Contract ................................................................................................ 12

  A. Plaintiffs' Refusal to Effectuate the Loan is a Breach of the
   Servicing Agreement ............................................................................... 13

  B. Plaintiffs Failed to Exercise Their Option to Purchase the Loan ............. 16

 II. Devonshire is Entitled to Attorneys' Fees and Costs Under the Servicing
  Agreement Upon Obtaining a Favorable Judgment ............................................. 18

CONCLUSION ........................................................................................................................ 18

# TABLE OF AUTHORITIES

Page(s)

CASES

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)..................................................................................................11, 12

*Bartholf v. Hautala,*
   194 N.Y.S.2d 660, 663 (N. Y. Sup. Ct. 1959) ......................................................17

*Beyer v. Cnty. of Nassau,*
   524 F.3d 160 (2d Cir. 2008)...................................................................................11

*BNP Paribas Mortg. Corp. v. Bank of Am.,*
   778 F. Supp. 2d 375 (S.D.N.Y. 2011).....................................................................16

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)................................................................................................11

*Hicks v. Baines,*
   593 F.3d 159 (2d Cir. 2010)...................................................................................11

*In re Eastern Sys., Inc.,*
   105 B.R. 219 (S.D.N.Y. 1989)...............................................................................17

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.,*
   309, F.3d 76. 83 (2d Cir. 2002).......................................................................12, 16

*L&B 57th Street, Inc. v. E.M. Blanchard, Inc.,*
   143 F.3d 88 (2d Cir. 1998).....................................................................................16

*Matsushita Elec. Indust. Co., Ltd, v. Zenith Radio Corp.,*
   475 U.S. 574 (1986)................................................................................................11

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.,*
   906 F.2d 884 (2d. Cir. 1990)..................................................................................17

*S-Devonshire, LLC et al. v. Devonshire Campus, LLC,*
   Index No. 651972/2013 (N.Y. Sup. Ct. 2013) .........................................................1

*S-Devonshire, LLC et al. v. Devonshire Campus, LLC,*
   Index No. 652013/2013 (N.Y. Sup. Ct. 2013) .........................................................1

*Scott v. Harris,*
   550 U.S. 372 (2007)................................................................................................12

**OTHER AUTHORITIES**

Civil Rule 56.1 ...................................................................................................................2

Fed. R. Civ. P. 54(d) .........................................................................................................18

Fed. R. Civ. P. 56 .....................................................................................................1, 2, 11

Local Rule 56.1 ..................................................................................................................2

Defendant/Counterclaim Plaintiff Devonshire Campus, LLC respectfully submits this memorandum of law in support of its motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure as to its counterclaims and all claims asserted against it in the complaints filed in these actions.

## PRELIMINARY STATEMENT

This dispute between lenders arises from the attempts of Plaintiffs/Counterclaim Defendants S-Devonshire, LLC and S1-Devonshire, LLC ("Plaintiffs" or, collectively, the "Note B Holder") to thwart the exercise by Defendant/Counterclaim Plaintiff Devonshire Campus, LLC ("Devonshire" or the "Note A Holder") of its rights as the senior note holder under a Co-Lender and Servicing Agreement (the "Servicing Agreement").[1]  One year after the Loan had matured by its terms and a foreclosure proceeding had been commenced on the property, Devonshire, as was its right, invoked the loan-sale provision of the Servicing Agreement by providing notice on May 8, 2013 (the "Sale Notice") of its intent to sell the Loan for $84 million (the "Loan Sale"). Under the Servicing Agreement, Plaintiffs, as junior holders, had until June 6, 2013 to exercise their option to buy the loan on the terms set forth in the Sale Notice (the "Buyout Option"). Instead of purchasing the loan on those terms or receiving their share of the purchase price, Plaintiffs engaged in a transparent scheme to hold the Loan Sale hostage by terminating the servicer charged with effectuating the sale, appointing themselves as the new servicer, refusing to carry out the Loan Sale, and purportedly exercising the Buyout Option but refusing to close

---

[1] The Servicing Agreement is annexed as Exhibit A to the Complaint filed in *S-Devonshire, LLC et al. v. Devonshire Campus, LLC*, Index No. 651972/2013 (N.Y. Sup. Ct.), June 4, 2013, now before this Court as Docket No. 13 Civ. 3934 (the "Servicer Compl."), and as Exhibit B to the Complaint filed in *S-Devonshire, LLC et al. v. Devonshire Campus, LLC*, Index No. 652013/2013 (N.Y. Sup. Ct.), June 6, 2013, now before this Court as Docket No. 13 Civ. 3941 (the "Note B Holders Compl.").  The Servicer Compl. and Note B Holders Compl. are respectively annexed as Exhibit 1 and Exhibit 2 to the accompanying Declaration of Michael D. Hynes.

the Loan Sale by July 19, 2013, and commencing two lawsuits in New York Supreme Court against Devonshire. Plaintiffs' tactics are designed to indefinitely extend the deadline by which they must exercise the Buyout Option while depriving Devonshire of its ability to close the Loan Sale by July 19, 2013 as mandated by the Servicing Agreement.

This dispute can be resolved as a matter of law by the interpretation of a single contract provision: Section 4(g)(xi) of the Servicing Agreement. Given the absence of any dispute of material fact and the lack of ambiguity in the Servicing Agreement, this Court can conclude without discovery or a trial that Plaintiffs have breached Section 4(g)(xi) of the Servicing Agreement by refusing to effectuate the Loan Sale, and that Plaintiffs failed to timely exercise their option to purchase the Loan. As a result, Devonshire respectfully requests that the Court grant summary judgment to Devonshire dismissing Plaintiffs' claims, granting Devonshire's counterclaims, compelling Plaintiffs to take any and all actions reasonably required to effectuate the Loan Sale to ELP West Palm, LLC no later than July 19, 2013, and ordering Plaintiffs to pay Devonshire's reasonable attorneys' fees and costs as required by Section 8(l) of the Servicing Agreement.

## STATEMENT OF UNDISPUTED FACTS

In accordance with Rule 56(c) of the Federal Rules of Civil Procedure and Local Rule 56.1, Devonshire has set forth the undisputed facts supporting this motion, with appropriate citations to the pleadings, in its accompanying Statement of Defendant Devonshire Campus, LLC of Material Facts as to Which There is No Genuine Dispute Pursuant to Local Civil Rule 56.1 ("56.1 Statement"). Those facts without citation are set forth below.

*The Loan*

Pursuant to a Credit and Security Agreement dated May 1, 2007 (the "Loan Agreement"), Devonshire at PGA National, LLC, Chatsworth PGA Properties, LLC, and Chatsworth at PGA National, LLC (collectively, the "Borrowers") secured a loan (the "Loan") composed of the following notes:  (1) a term loan evidenced by a promissory note in the original principal amount of $75,000,000 ("Note A");   (2) a term loan evidenced by a promissory note in the original principal amount of $40,000,000 ("Note B");   (3) a term loan evidenced by a promissory note in the original principal amount of $40,220,000 ("Note C");   and (4) a revolving loan evidenced by a promissory note in the original principal amount of $6,400,000 ("Note C-Rev").   *See* 56.1 Statement at ¶ 1.[2]  Each note was made by the Borrowers, each as maker, and by Merrill Lynch Capital, a Division of Merrill Lynch Business Financial Services Inc., a Delaware corporation ("Merrill Lynch"), as payee.  ¶ 2.

On or about July 15, 2007, Borrowers amended and restated Note B into two separate notes, each in the original principal amount of $20,000,000 ("Note B-1" and "Note B-2," respectively).  ¶ 3.  Note C and Note C-Rev have since been consolidated and are now simply called Note C (collectively with Note A, Note B-1, and Note B-2, the "Notes").  ¶ 4.

*The Borrowers*

The Borrowers own and operate a continuing care retirement community in Palm Beach Gardens, Florida, known as Devonshire at PGA National, consisting of approximately 327 independent living apartments, 76 skilled nursing beds, 22 assisted living units and 20 memory care (*i.e.*, Alzheimer's) beds.  ¶¶ 5-6.

---

[2]  Other references herein to the 56.1 Statement are denoted simply as "¶ __."

*The Lenders*

Each of these Notes has since been sold multiple times.  ¶ 7.  Devonshire is the current owner and holder of both Note A and Note C (in those capacities, the "Note A Holder" and "Note C Holder," respectively).  ¶ 8.  Plaintiff S1-Devonshire is the current owner and holder of Note B-1, and Plaintiff S-Devonshire is the current owner and holder of Note B-2 (collectively, the "Note B Holder").  ¶ 9.  In other words, Devonshire is the senior note holder and Plaintiffs are junior note holders.  ¶ 10.  The Loan is secured by a Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing (the "Mortgage") on Devonshire at PGA National. ¶ 11.

*The Servicing Agreement and the Servicer*

In August 2007, Merrill Lynch and the then-note holders entered into the Servicing Agreement, which now governs the contractual relationship between the parties to this dispute. ¶¶ 12-13.   The Servicer[3] is charged with, among other duties, making "commercial[ly] reasonable efforts to collect all payments" due under the Loan and taking "any and all actions with respect to the Loan and exercis[ing] all powers as are incidental thereto."  ¶ 14.  Pursuant to an Appointment, Assumption and Amendment Agreement dated April 20, 2012, TriMont Real Estate Advisors, Inc., a Georgia corporation ("TriMont"), was appointed the new Servicer under the Servicing Agreement.  ¶ 17.

---

[3]  The Servicing Agreement also provides for the appointment of a "Special Servicer" to manage the loan following certain material defaults, although the Servicing Agreement makes no meaningful distinction between the roles of Servicer and Special Servicer (in fact, the definition of "Servicer" in the Servicing Agreement refers interchangeably to the party designated as Servicer "or, as applicable, the Special Servicer").  ¶¶ 15-16.  Except as may be noted otherwise, all references to "Servicer" herein are also references to the Special Servicer, as applicable.

*The Borrower Defaults on the Loan*

The maturity date of the Loan was April 30, 2012 (the "Maturity Date").   ¶ 18. According to the Second Amended Complaint filed in the Foreclosure Action (as defined below), the principal indebtedness due at the Maturity Date was equal to $158,193,915.93, together with interest which accrued thereon.  ¶ 19.  The Borrowers failed to pay the principal indebtedness due at the Maturity Date.  *Id*.  This was a Triggering Event of Default under the Servicing Agreement.  ¶ 20.  Devonshire has not received distributions pursuant to Section 2(b) of the Servicing Agreement sufficient to repay in full the principal balance of Note A, all accrued but unpaid interest thereon, and any Realized Losses with respect to Note A within 12 months of the Maturity Date (*i.e.*, April 30, 2013).  ¶ 21.  As such, Devonshire's right to exercise the loan-sale provision under Section 4(g)(xi) of the Servicing Agreement was triggered as of May 1, 2013. ¶ 22.

*The Foreclosure*

On August 8, 2012, TriMont commenced a foreclosure action in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida (the "Foreclosure Action") against the Borrowers for the benefit of the note holders.  ¶ 23.  On May 1, 2013, TriMont filed a second amended complaint, which alleges causes of action for Foreclosure of Mortgage (Count I), Foreclosure of Security Interest (Count II), Breach of Promissory Note (Note A) (Count III), Breach of Amended and Restated Promissory Note (Note B-1) (Count IV), Breach of Amended and Restated Promissory Note (Note B-2) (Count V), Breach of Promissory Note (Note C) (Count VI) and Breach of Guaranty (Count VII).  ¶ 24.

*The Sale Notice, Plaintiffs' Buyout Option and the Loan Sale Closing Deadlines*

On May 8, 2013, Devonshire (the Note A Holder and the Note C Holder) provided notice (the "Sale Notice") to TriMont (the Servicer) and the Plaintiffs (the Note B Holder) that it intended to sell and assign the Loan pursuant to Section 4(g)(xi) of the Servicing Agreement to an entity known as ELP West Palm, LLC, which is under partial common ownership with Devonshire, for a purchase price of $84 million.[4]  ¶ 25.  Devonshire included with the Sale Notice an Assignment and Assumption providing the terms and conditions of the Loan Sale. ¶ 26.

Section 4(g)(xi) of the Servicing Agreement provides, in pertinent part:

Notwithstanding anything contained in this Agreement to the contrary, if . . . (B) Note A Holder fails to receive distributions pursuant to Section 2(b) that are sufficient to repay in full the Note A Principal Balance and any Realized Losses with respect to Note A within twelve (12) months of the scheduled maturity date of the Loan . . ., then, at the direction of Note A Holder, the Servicer shall sell and assign the Loan . . . to any Person, and on such terms and conditions, as Note A Holder shall direct . . . *provided* . . . that Note A Holder shall give notice of its intent to exercise its rights pursuant to this Section 4(g)(xi) to the other Holders, including the terms and conditions of such sale and assignment, no less than thirty (30) Business Days prior to any such sale and assignment to a third party (a **"Sale Notice"**).   In such event, Note C Holder shall have ten (10) Business Days to exercise its option to purchase Note A and Note B . . . .  If Note C Holder fails to timely exercise such option, Note B Holder shall have the right to purchase Note A Holder's interests in the Loan on the terms and conditions of the Sale Notice (as to the Note B Holder, on a pro rata basis) without regard to whether the terms and conditions of such sale yield to Note A Holder the Defaulted Loan Note A Purchase Price.  Note B Holder shall exercise its rights pursuant to this Section 4(g)(xi) by written notice to Note A Holder served within twenty (20) Business Days of Note B Holder's receipt of the Sale Notice (a **"Buy Notice"**), and Note B Holder shall purchase the Loan . . . within thirty (30) Business Days of serving said Buy Notice or Note C Holders failure to consummate a purchase of Note A and Note B . . . .   In the event that Note B Holder fails to deliver the Buy Notice or to close on the sale and assignment of the Loan . . . within the time periods

---

[4]  Because the Sale Notice was delivered after close of business on May 7, 2013, the Sale Notice was effective as of May 8, 2013.  ¶ 25 n.3.

herein described, Note B Holder's rights under this Section 4(g)(xi) shall expire and be of no further force and effect. Notwithstanding the foregoing (a) in the event that Note B Holder waives its rights hereunder by electing not to deliver a Buy Notice, Note A Holder shall have a period of thirty (30) Business Days following such waiver to close on the sale and assignment of the Loan . . . , and (b) in the event that Note B Holder timely serves the Buy Notice to Note A Holder but fails to close on the purchase of the Loan . . . within the aforementioned thirty (30) Business Day period, then . . . Note A Holder shall have a period of three (3) months following Note B Holder's failure to close in which to enter into a term sheet or letter of intent with either the same third party or a new third party on the same terms initially set forth in the Sale Notice (or on terms more favorable to the Holders as a collective whole) and Note A Holder shall have a period of thirty (30) Business Days following the execution of such term sheet or letter of intent to close such sale and assignment to a third party.

¶ 27 (emphasis in the original).  Importantly, Section 4(g)(xi) of the Servicing Agreement further provides that "[t]he Servicer and Holders shall take any and all actions reasonably required to effectuate such sale."  ¶ 28.

Under Section 4(g)(xi), therefore, the May 8, 2013 Sale Notice triggered the following deadlines:

- <u>May 22, 2013</u>:  Note C Holder's deadline to exercise its Buyout Option in accordance with the Sale Notice terms.[5]  ¶¶ 29-30.

- <u>June 6, 2013</u>:  Plaintiffs' deadline to exercise their Buyout Option in accordance with the Sale Notice terms.  ¶¶ 29, 31.

- <u>June 6, 2013-July 19, 2013</u>:  Plaintiffs' window to close on the Loan Sale if their Buyout Option is exercised on or before June 6, 2013.  ¶¶ 29, 32.

- <u>June 20, 2013-July 19, 2013</u>:  Devonshire's window to close on the Loan Sale if Plaintiffs failed to exercise their Buyout Option by June 6, 2013.  ¶¶ 29, 33.

---

[5] The Note C Holder, which is the same entity as the Note A Holder, did not exercise its option.  ¶ 35.

- <u>July 20, 2013-October 21, 2013</u>:  Devonshire's window to enter into a term sheet or letter of intent on the same or more favorable terms as set forth in the Sale Notice if Plaintiffs exercise their Buyout Option on or before June 6, 2013 but fail to close by July 19, 2013.  ¶¶ 29, 34.

*Plaintiffs Appoint Themselves as the New Servicer*

The day after receiving the Sale Notice, on May 9, 2013, Plaintiffs notified Devonshire that they were terminating TriMont as Servicer effective in 45 days and as Special Servicer effective in 15 days, and appointing themselves as both Servicer and Special Servicer.  ¶ 36.  As a result of Plaintiffs' termination of TriMont as Special Servicer, Plaintiffs, in their dual role as Special Servicer and Controlling Holder, direct the continued prosecution of the Foreclosure Action.  ¶ 37.

*The Plaintiffs Refuse to Effectuate the Sale of the Loan Pursuant to the Sale Notice*

In its May 14, 2013 letter to Plaintiffs and TriMont, Devonshire set forth the "relevant procedures and deadlines in connection with the consummation of the" Loan Sale, including the deadlines triggered by the Sale Notice.  ¶ 38.  Devonshire requested that TriMont and/or the Plaintiffs "notify it in writing . . . of any objections or disagreement with the timeline, procedures and purchase price" described by Devonshire.  ¶ 39.

In their May 16, 2013 letter, Plaintiffs informed Devonshire that they disagreed that Devonshire's May 14, 2013 letter "correctly sets out the timeline and procedure governing" the Loan Sale.  ¶ 40.  Plaintiffs accused Devonshire of "paraphras[ing] certain provisions of the Co-Lender and Servicing Agreement [and taking] them out of context and misconstru[ing] them."  ¶ 41.  Plaintiffs also alleged that Devonshire's May 14, 2013 letter omitted "certain of the most relevant, important and dispositive provisions of the agreement entirely."  ¶ 42.  Plaintiffs' May 16, 2013 letter did not identify the provisions they regarded as the "most relevant, important and

dispositive," nor did it explain which provisions Devonshire purportedly had taken out of context. ¶ 43.

In its May 22, 2013 letter, Devonshire explained that the timeline and procedures outlined in its May 14, 2013 letter "strictly comport with the requirements set forth in Section 4(g)(xi)" of the Servicing Agreement, and requested that Plaintiffs identify the other provisions they regarded as the "most relevant, important and dispositive." ¶¶ 44-45.

In their May 24, 2013 letter, Plaintiffs notified Devonshire that they were assuming the role of Servicer immediately and that they would "determine an appropriate course of action with respect to" the Sale Notice. ¶ 46. In its May 29, 2013 letter to Plaintiffs, Devonshire stated that "[t]he role of the Special Servicer with respect to the sale and assignment provisions of section 4(g)(xi)" of the Servicing Agreement "is to execute the sale; there is no room for discretion nor does the [Servicing Agreement] afford the Special Servicer the right to determine a course of action." Devonshire also reiterated its request that the Plaintiffs explain the basis for their objections to the Sale Notice. ¶¶ 47-48.

In their June 3, 2013 letter, Plaintiffs informed Devonshire that they would not "effectuate the Loan Sale under the terms and conditions provided for in the Sale Notice and accompanying Assignment Agreement because effectuation of the Loan Sale for $84,000,000 does not comply with the Servicing Standard. Accordingly, the Note A Holder's proposed Loan Sale will not go forward." ¶ 49.

*The Plaintiffs Commence Litigation Against Devonshire*

The next day, on June 4, 2013, the Plaintiffs, in their capacity as Servicer, sued Devonshire in the Supreme Court of the State of New York, County of New York, seeking a declaration that they had acted "within the Servicing Standard in determining not to effectuate

the Loan Sale and determining that the proposed Loan Sale would not proceed."   ¶ 51. Specifically, the Plaintiffs alleged that "other actions are available that may facilitate a realization of increased value to *all* Holders" and that selling the Loan for $84 million would not "maximize a return to all the Holders on a net present value basis."   ¶ 52 (emphasis in the original).

### The Plaintiffs Attempt to Indefinitely Toll Their Option on the Loan Sale

In their June 5, 2013 letter to Devonshire, the Plaintiffs claimed that they did not have to exercise their Buyout Option on or before June 6, 2013 because their June 3, 2013 determination that the Loan Sale could not go forward was now the subject of the litigation they had commenced.  ¶ 53.  That same day, Devonshire notified Plaintiffs that they must exercise their Buyout Option by June 6, 2013 to comply with the Servicing Agreement, and that the deadlines set forth in Section 4(g)(xi) of the Servicing Agreement were not tolled by Plaintiffs' June 3, 2013 letter or the litigation Plaintiffs had commenced.  ¶ 54.

In a June 6, 2013 letter, Plaintiffs stated that if a "court of competent jurisdiction" determines that they unlawfully failed to carry out the Loan Sale, "this letter shall be notice that the Note B Holder shall be deemed to have timely exercised its option pursuant to Section 4(g)(xi) of the Servicing Agreement to purchase the Loan . . . ."  ¶¶ 55-56.

### The Plaintiffs Sue Devonshire Again

That same day – June 6, 2013 – the Plaintiffs, this time in their capacity as Note B Holder, again sued Devonshire in the Supreme Court for the State of New York, County of New York, seeking a declaration that they were not required to exercise their Buyout Option because their refusal to effectuate the Loan Sale as Servicer was now the subject of the litigation they had

commenced.  ¶¶ 57-58.  On June 10, 2013, Devonshire removed both cases to this Court before filing an Answer with Counterclaims in each case on June 12, 2013.  ¶¶ 59-60.

## APPLICABLE LEGAL STANDARD

Summary judgment is granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party bears the initial burden of identifying "particular parts of materials in the record" showing that there is no genuine dispute as to any material fact, Fed. R. Civ. P. 56(c)(1)(A), or that the non-moving party has "failed to make a sufficient showing on an essential element of her case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see* Fed. R. Civ. P. 56(c)(1)(B).

The burden then shifts to the non-moving party, which must establish the existence of a genuine dispute as to a material fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1).  A genuine dispute only exists where "the evidence is such that a reasonable jury could decide in the non-movant's favor."  *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008).  However, "[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  The non-moving party "must do more than simply show that there is a metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party there is no 'genuine issue for trial.'"  *Matsushita Elec. Indust. Co., Ltd, v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be

no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in the original). Further, while the Court must grant the non-moving party the benefit of "justifiable" inferences, *id.* at 255, this requirement extends only to inferences that are "supportable by the record." *Scott v. Harris,* 550 U.S. 372, 381 n.8 (2007).

## **ARGUMENT**

I. **Devonshire is Entitled to Summary Judgment on its Counterclaim for Breach of Contract**

In their Complaints, Plaintiffs seek declarations that (A) they did not breach the Servicing Agreement by refusing to effectuate the Loan Sale, and (B) if this Court determines that they did breach the Servicing Agreement, that Plaintiffs timely exercised their right to purchase the Loan on June 6, 2013 and should be given an additional 30 business days to decide whether to close on the Loan Sale.  ¶¶ 51-52, 57-58; Hr'g Tr., June 24, 2013, at 15:17-23 ("In our opinion, your Honor, the B noteholder doesn't have to make a decision until a decision has been made as to whether the special servicer acted appropriately or not. If the Court determines that the special servicer acted appropriately in not effectuating the loan sale, the B noteholder does not have to exercise his option right now.")  In its Counterclaims for Breach of Contract and Specific Performance, Devonshire has alleged that (A) Plaintiffs' failure to effectuate the Loan Sale is a breach of the Servicing Agreement, and (B) Plaintiffs did not exercise their option to purchase the Loan because they failed to agree to close the Loan Sale on or before July 19, 2013.

Thus, Devonshire's counterclaims and Plaintiffs' claims collectively present the same set of undisputed facts and the same two questions of contract interpretation, which this Court can resolve as a matter of law in response to Devonshire's motion for summary judgment because Section 4(g)(xi) of the Servicing Agreement is unambiguous.  *See, e.g., Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309, F.3d 76. 83 (2d Cir. 2002) ("If the Court finds that the contract

is not ambiguous it should assign the plain and ordinary meaning to each term and interpret the contract without aid of extrinsic evidence and it may then award summary judgment.").

A.      Plaintiffs' Refusal to Effectuate the Loan is a Breach of the Servicing Agreement

It is undisputed that the Borrowers failed to repay the principal balance and any Realized Losses with respect to Note A within 12 months of the Maturity Date.  ¶¶ 18-21.  It is also undisputed that Devonshire provided then-Servicer TriMont and Plaintiffs with the Sale Notice enclosing the Assignment and Assumption indicating its intent to sell the Loan for $84 million effective on May 8, 2013.  ¶¶ 25-26.   The issuance of the Sale Notice was specifically contemplated by the Servicing Agreement, which provides, in pertinent part, that:

> Notwithstanding anything contained in this Agreement to the contrary, if [] [Devonshire] fails to receive distributions pursuant to Section 2(b) that are sufficient to repay in full the Note A Principal Balance and any Realized Losses with respect to Note A within twelve (12) months of the scheduled maturity date of the Loan . . . then, at the direction of [Devonshire], the Servicer <u>shall</u> sell and assign the Loan . . . to any Person, and on such terms and conditions, as [Devonshire] shall direct . . . *provided* . . . that [Devonshire] shall give notice of its intent to exercise its rights pursuant to this Section 4(g)(xi) to the other Holders, including the terms and conditions of such sale and assignment, no less than thirty (30) Business Days prior to any such sale and assignment to a third party (a **"Sale Notice"**). . . .  [Plaintiffs] <u>shall</u> exercise its rights pursuant to this Section 4(g)(xi) by written notice to [Devonshire] served within twenty (20) Business Days of [Plaintiffs'] receipt of the Sale Notice (a **"Buy Notice"**), and [Plaintiffs] <u>shall</u> purchase the Loan . . . within thirty (30) Business Days of serving said Buy Notice . . . .  In the event that [Plaintiffs] fail[] to deliver the Buy Notice or to close on the sale and assignment of the Loan . . . within the time periods herein described, [Plaintiffs'] rights under this Section 4(g)(xi) <u>shall</u> expire and be of no further force and effect.

¶ 27 (underlining supplied, other emphasis in the original).

Once Devonshire invoked its right to sell the Loan, the Servicing Agreement gave Plaintiffs until June 6, 2013 (20 business days after receiving the May 8, 2013 Sale Notice) to exercise their Buyout Option on the terms offered in the Sale Notice with Assignment and Assumption.  If Plaintiffs exercised their option by June 6, 2013, they had until July 19, 2013 to

close on the Loan Sale.  If Plaintiffs did not exercise that option, Devonshire could close the Loan Sale as early as June 20, 2013 and as late as July 19, 2013.  This too is undisputed.

Plaintiffs admit in their Complaints that they nonetheless have refused to effectuate the Loan Sale by the July 19, 2013 deadline.  ¶¶ 51, 57; *see also* ¶ 56.  Plaintiffs attempt to justify this refusal by claiming that the amount of the Loan Sale ($84 million) would not "maximize a return to all the Holders on a net present value basis."  ¶ 52.  But the Servicer has no discretion to subjectively evaluate the terms of the Loan Sale under Section 4(g)(xi) of the Servicing Agreement or to decline to proceed with the Loan Sale by unilaterally deeming those terms unsatisfactory.  In fact, Section 4(g)(xi) states that, "[n]otwithstanding anything contained in this Agreement to the contrary, . . . at the direction of Note A Holder, the Servicer <u>shall</u> sell and assign the Loan . . . to any Person, <u>and on such terms and conditions</u>, as Note A Holder shall direct."  ¶ 27 (emphasis supplied).  Of course, Plaintiffs knew all along that they purchased a note that was junior to Devonshire's, and that Devonshire's Note A would have to be repaid in full before Plaintiffs could see any recovery.  This is the very nature of multi-lender, multi-tranche loan transactions.  Thus, the Servicer's only role under Section 4(g)(xi) is to take any and all actions reasonably required to effectuate the Loan Sale consistent with the terms and deadlines set by the Servicing Agreement.

This makes perfect sense because the Servicing Agreement permits the senior note holder (Devonshire) to set the terms of the Loan Sale, but then provides the junior note holders (Plaintiffs) with the Buyout Option:  a chance to purchase the Loan on the same terms set by the senior note holder.  As this Court has observed, the Buyout Option protects the junior note holders, who have the option to buy the Loan if they consider the sale price set by the senior note holder to be unreasonably low.  *See* Hr'g Tr., June 24, 2013, at 8:2-5, 13:22-24 (THE COURT:

"But this takes care of that, right?  Because . . . if this is a fire sale, the [junior note holder] can buy at the fire sale price and then resell it at the higher price later. . . .  [I]sn't the solution for B to just buy it cheap and sell it high?  Isn't that what the contract contemplates?").  As a result, there is absolutely no reason for the Plaintiffs to refuse to effectuate the Loan Sale.

Unable to reconcile their actions with either the dictates of common sense or the express directions set forth in Section 4(g)(xi) of the Servicing Agreement, Plaintiffs cling to Section 4(a) of the Servicing Agreement, which provides as follows:

> Servicer shall service the Loan in a commercially reasonable manner for the benefit of the Holders (as a collective whole, taking into account their relative priority) and in accordance with applicable law, the terms of this Agreement and the terms of the Loan Documents, and to the extent consistent with the foregoing, with the same care, skill and diligence applied by Servicer in servicing loans owned entirely for its own account or for third parties, whichever is higher, with a view to the maximization of the recovery of the Loan on a net present value basis, and without regard to any other relationship that Servicer or its Affiliates has with Borrower or its Affiliates or any interest that Servicer or its Affiliates may have in the Loan (the "Servicing Standard").  Servicer has waived the right to receive any servicing fees or other compensation with respect to the performance of its duties as Servicer hereunder.

¶ 50.

Section 4(a), however, does not apply here.  Section 4(g)(xi) of the Servicing Agreement leads with the dispositive phrase "[n]otwithstanding anything contained in this Agreement to the contrary" and then provides that "at the direction of Note A Holder, the Servicer <u>shall</u> sell and assign the Loan . . . to any Person, <u>and on such terms and conditions</u>, as Note A Holder shall direct."  ¶ 27 (emphasis supplied).  Plaintiffs' claim that their subjective application of Section 4(a)'s "Servicing Standard" somehow overrides Section 4(g)(xi)'s express instruction that Plaintiffs "shall sell and assign the Loan . . . to any Person, on such terms and conditions, as Note A Holder shall direct" is unreasonable on its face.  Indeed, Section 4(g)(xi)'s introductory phrase – "[n]otwithstanding anything contained in this Agreement to the contrary" – trumps any

potential conflict with Section 4(a).  *See, e.g.*, *L&B 57th Street, Inc. v. E.M. Blanchard, Inc.*, 143 F.3d 88, 92-93 (2d Cir. 1998) ("Because the Good Guy clause provides that its application is 'notwithstanding anything herein to the contrary,' it trumps the clause guaranteeing the payment of attorney's fees and other expenses."); *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 90-91 (2d Cir. 2002) ("Because the FC & S clause begins with the phrase '[n]otwithstanding anything herein contained to the contrary,' we hold that the District Court properly granted summary judgment to IINA.  Such language means that the FC & S clause trumps any other provisions of the IINA Policy."); *BNP Paribas Mortg. Corp. v. Bank of Am.*, 778 F. Supp. 2d 375, 400 (S.D.N.Y. 2011) ("Under New York law, the language '[n]otwithstanding anything in this Base Indenture to the contrary' trumps all other provisions").

Based on these undisputed facts and the only reasonable reading of the Servicing Agreement, the only conclusion that can be reached is that Plaintiffs have breached their obligation to "sell and assign the Loan . . . to any Person, and on such terms and conditions, as Note A Holder shall direct," and to take "any and all actions reasonably required to effectuate such sale."

B.      Plaintiffs Failed to Exercise Their Option to Purchase the Loan

Plaintiffs claim that their June 6, 2013 letter effectively exercised their Buyout Option. In that letter, Plaintiffs state, in pertinent part:

> Please be advised that, in the event that it is determined by a court of competent jurisdiction that the Special Servicer's actions were not justified and that it did not act in accordance with the Servicing Standard in determining not to proceed with the Loan Sale and that therefore, the Loan Sale should then proceed in accordance with the terms and conditions of the Servicing Agreement, then this letter shall be notice that the Note B Holder shall be deemed to have timely exercised its option pursuant to Section 4(g)(xi) of the Servicing Agreement to purchase the Loan in accordance with the terms and conditions of the Servicing Agreement and will then have thirty (30) Business Days to close.

¶ 55.

As Plaintiffs' counsel later stated:  "In our opinion, your Honor, the B noteholder doesn't have to make a decision until a decision has been made as to whether the special servicer acted appropriately or not.  If the Court determines that the special servicer acted appropriately in not effectuating the loan sale, the B noteholder does not have to exercise his option right now."  Hr'g Tr., June 24, 2013, at 15:17-23.

Based on these undisputed facts, this "conditional" notice is defective on its face because Plaintiffs refused to close on the Loan Sale by July 19, 2013 (30 business days after June 6, 2013) as required by Section 4(g)(xi).  Instead, Plaintiffs ask this Court to re-write the Servicing Agreement to provide them with far more than 30 business days (the deadline set by Section 4(g)(xi)) to close the Loan Sale.  This Court should not accept Plaintiffs' invitation.  *See, e.g.*, *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) ("[T]he court must be careful not to alter the terms of the agreement.  The parties having agreed upon their own terms and conditions, the courts cannot change them and must not permit them to be violated or disregarded.") (internal citations omitted).

Rather, under New York law, Plaintiffs' June 6, 2013 letter was not a valid exercise of the Buyout Option because they refused to close the Loan Sale by July 19, 2013.  *See In re Eastern Sys., Inc.*, 105 B.R. 219, 229 (S.D.N.Y. 1989) (an option "must be unequivocally accepted according to its terms and conditions") (citing *Barthof v. Hautala*, 194 N.Y.S.2d 660, 663 (N. Y. Sup. Ct. 1959) (plaintiffs' so-called "purchase offer was not a valid exercise of the option" "since it contains numerous conditions and terms not found in the original option")).  Accordingly, we respectfully request that the Court compel Plaintiffs to effectuate the Loan Sale to ELP West Palm, LLC no later than July 19, 2013 pursuant to Section 4(g)(xi) of the Servicing Agreement and the Sale Notice and Assignment and Assumption.

II. **Devonshire is Entitled to Attorneys' Fees and Costs Under the Servicing Agreement Upon Obtaining a Favorable Judgment.**

As demonstrated above, Plaintiffs have breached the Servicing Agreement by refusing to effectuate the Loan Sale and by failing to take the actions necessary to close the Loan Sale by July 19, 2013.  In light of these breaches, Plaintiffs must pay Devonshire's reasonable attorneys' fees and costs.  *See* Section 8(l) of the Servicing Agreement ("If either party to this Agreement obtains a judgment against the other party by reason of any breach of this Agreement, reasonable attorneys' fees and costs as fixed by the court will be included in such judgment.").  ¶ 61. Devonshire will establish the precise amount of such fees and costs within 14 days of the entry of judgment as provided by Fed. R. Civ. P. 54(d).

## CONCLUSION

For all of the foregoing reasons, Defendant Devonshire Campus, LLC respectfully requests this Court grant summary judgment dismissing all claims against Devonshire and awarding Devonshire the following relief against Plaintiffs:

1.      An order requiring the performance by Plaintiffs of their obligations under the Servicing Agreement, and in particular their obligation as Special Servicer to "take any and all actions reasonably required to effectuate" the sale of the Loan to ELP West Palm, LLC no later than July 19, 2013 pursuant to Section 4(g)(xi) of the Servicing Agreement and the Sale Notice and Assignment and Assumption served by Defendant in its capacity as Note A Holder on May 8, 2013;

2.      Reasonable attorneys' fees and costs, as explicitly provided for by Section 8(l) of the Servicing Agreement, and

3.      Such other and further relief as this Court deems just and proper.

Dated:   June 27, 2013
         New York, New York

Respectfully submitted,

By:    /s/ Michael D. Hynes
       Thomas R. Califano
       Michael D. Hynes
       Joseph S. Alonzo

       DLA PIPER LLP (US)
       1251 Avenue of the Americas
       New York, NY  10020-1104
       (212) 335-4500

       *Attorneys for Devonshire Campus, LLC*